ECONOMY POWER CO. v. DASKAM.

TAXATION—MORTGAGES—MORTGAGE TAX—SPECIFIC TAX.
  Where a Michigan corporation executed a blanket trust mort-
  gage of $5,500,000 securing bonds which were only partly
  issued prior to January 1, 1912, when the specific mortgage
  tax became effective (Act No. 91, Pub. Acts 1911), and there-
  after issued more bonds and increased its mortgage indebt-
  edness in pursuance of provisions in the trust instrument, on
  the basis of other property purchased, it was not entitled to
  have a supplemental instrument, reciting the original trust
  arrangement and covering the subsequently acquired proper-
  ty, placed on record without paying the entire tax on the
  whole amount of bonds issued.

Certiorari to Calhoun; North, J.   Submitted February
18, 1913.   (Calendar No. 25,436.)   Decided March 20,
1913.

Mandamus by the Economy Power Company against
C. Howard Daskam, register of deeds of Calhoun county,
to compel respondent to receive for record a mortgage.
The lower court refused the writ.   Relator brings certio-
rari.   Affirmed.

*George W. Mechem* and *A. C. McIlvaine*, for relator.

*Grant Fellows*, Attorney General, *Edward Waer*,
Assistant Attorney General, and *Robert H. Kirschman*,
Prosecuting Attorney, for respondent.

Relator reviews by certiorari an order made by the cir-
cuit judge of Calhoun county refusing to issue a writ of
mandamus against respondent.

The relator is a Michigan corporation.   On February
11, 1911, it duly executed a mortgage to Harris Trust &
Savings Bank of Chicago, Ill., a foreign corporation, as

trustee for bondholders. The mortgage was given to secure payment of all bonds issued or to be issued thereunder. The limit of the amount of bonds to be issued was fixed at $5,500,000, except with the consent of the mortgagor and the holders of all the bonds issued and outstanding, when an increased issue might be authorized. The mortgage provides for the immediate issue and delivery to the mortgagor of bonds to the amount of $1,250,000, the balance to be issued from time to time thereafter upon the basis of 90% of the cost of the acquisition of property, the construction, completion, extension, or improvement of facilities or for the improvement and maintenance of service. Up to January 1, 1912, bonds to the amount of $1,250,000 only were issued. Subsequent to January 1, 1912, and before November 6, 1912, bonds were issued in the further sum of $289,000. The instrument covered certain described real estate in three counties—Iosco, Kalamazoo, and Genesee. It also covered—

"All of the estate and properties, real, personal and mixed, rights, privileges, franchises and choses in action of every nature and kind and wheresoever situate now or hereafter owned or possessed or belonging to the company, or to which it is or may or might or could now or at any time hereafter be in any manner entitled in law or in equity."

This mortgage was duly recorded in the three counties named upon February 17, 1911. On November 6, 1912, relator having acquired some real estate in the county of Calhoun, and desiring to place the same specifically under the mortgage, as by its terms was required, it tendered to respondent the original mortgage, and a supplemental instrument, particularly describing and conveying the real estate acquired by it in Calhoun county, for record. Respondent refused to record the instruments or either of them until the relator had complied with the provisions of Act No. 91 of the Public Acts of 1911.

The applicable portions of said act requiring construction are as follows:

"Sec. 2. A tax of fifty cents for each one hundred dollars and each remaining major fraction thereof of the principal debt or obligation which is, or under any contingency may be, secured by a mortgage upon real property situated within this State recorded on or after the first day of January, 1912, is hereby imposed on each such mortgage and shall be collected and paid as hereinafter provided.   *   *   *

"Sec. 3. The tax imposed by this act shall be paid to and collected by the treasurer of the county where such mortgage is first presented for record, in the manner following:   Before said mortgage is received by the register of deeds for recording it shall be presented to the county treasurer, who shall, as one of his official duties, compute and collect the taxes due thereon, as provided by this act, and shall certify on said mortgage the amount secured thereby and the amount of taxes received by him. Said certificate shall be recorded by the register of deeds as a part of the record of said mortgage."

"Sec. 5. In case of mortgages made in trust to secure payment of bonds or obligations issued or to be issued thereafter, if only a partial amount of the indebtedness has been advanced thereon at the time of presentation for record such mortgage shall, at the end thereof, contain a sworn statement of the amounts advanced thereon and secured thereby, and the tax herein provided shall be computed on that basis. When a further amount is advanced thereon or becomes secured thereby the mortgagee shall immediately present to the county treasurer and file with the recording officer where such mortgage was first recorded a statement of the amount about to be further advanced or become further secured, and the tax on such amount shall thereupon become due and payable on such amount about to be advanced or secured, and it shall be paid in the same manner as to the original tax thereon as in this act provided.   *   *   *

"Sec. 6. The owner of any mortgage which is now, or which may be recorded before this act takes effect, may present to the county treasurer of the county in which said property is situated an affidavit setting forth the mortgage and the place of record thereof and the amount of principal secured thereby which is unpaid, and may pay a like tax of one-half of one per cent. upon such amount, and thereafter said mortgage for the purpose of taxation is to be considered and treated the same as other mortgages pro-

vided for in this act. Said affidavit shall be recorded in the office of the register of deeds and shall be *prima facie* proof of the amount of the principal unpaid on said mortgage. Mortgages given prior to January first, nineteen hundred twelve, and on which the registry tax provided for in this act shall not be paid, shall remain under the present *ad valorem* system of taxation and shall be assessed and taxed under the present law."

"SEC. 8. No mortgage or land contract, which is subject to the tax imposed by this act shall be released, enforced, discharged of record or received in evidence in any action or proceeding at law or in equity, nor shall any assignment of or agreement extending any such mortgage or land contract be recorded until the tax imposed thereon by this act shall have been paid as in this act provided. No judgment or final order in any action or proceeding at law or in equity shall be made for the foreclosure or enforcement of any such mortgage or land contract, which is subject to the tax imposed by this act, or any debt or obligation secured thereby, until the tax imposed by this act shall have been paid as provided in this act. The certificate of the county treasurer in form as hereinafter provided, shall be *prima facie* evidence of the payment of the tax."

Section 9 provides that, where a mortgage covers property in more than one county, the tax shall be paid only in the county where the instrument is first presented for record. Section 10 repeals all acts and parts of acts in contravention with the provisions of this act.

BROOKE, J. (*after stating the facts*). The history of this legislation is too well known to require much comment. The old or *ad valorem* system of taxation of mortgages was believed to be unsound economically as well as inefficient in operation. It seemed to result in many instances in the imposition of a double tax upon the same property. While doubtless intended as a relief to the borrower, its tendency seemed to be to increase his burden, and it placed domestic lenders of money upon real estate security at a distinct disadvantage when compared with the nonresident lender, in whose hands the mortgage escaped taxation.

Primarily the legislation was doubtless enacted to correct an alleged economic fallacy, and secondarily to place foreign and domestic loaners of money upon an equal footing. There can be no doubt that, if relator and the Harris Trust & Savings Bank (the mortgagee-trustee) choose to rest their respective rights upon the original instrument and the record thereof in the three counties named, they have a right under section 6 of the statute to do so. The mortgage would then remain under the *ad valorem* system of taxation, and, the mortgagee-trustee being a foreign corporation, no tax of any nature could be imposed or collected thereon. This, however, it seems is impracticable. The original mortgage contemplates the acquisition by the mortgagor of real estate and franchises outside the three counties named, but within the State. It further contemplates the subjection of such after acquired property to the lien of the mortgage and the issuance of additional bonds upon the faith of such added security. While the amount of bonds to be issued under the mortgage is presently limited to $5,500,000, this amount can be indefinitely increased by the joint action of the mortgagor and the bondholders. So that, if we understand the contention of relator, we have here an instrument which, at the time of its record, and up to January 1, 1912, stood as security for $1,250,000 only, but which through the acquisition of other property and the issuance of further bonds may in the future be enlarged to any indefinite amount without the payment of the tax imposed by the statute.

We are clearly of the opinion that this position is not tenable. To so hold would be to enable this relator to acquire real estate and other property without limit, to borrow money thereon and escape the payment, while all others in performing the same acts since January 1, 1912, would be subjected to the payment of the impost. Every such act of the relator is in effect the making of a new loan. It acquires property by purchase and borrows money thereon. The fact that the original mortgage was

recorded prior to the passage of the act can surely produce no such anomalous situation. Whenever (after January 1, 1912) it becomes necessary for relator, in order to subject newly-acquired property to the lien of the mortgage, and to give notice thereof to the world through registration, we are of opinion that such registration may be had only upon compliance with the terms of the act. This would certainly compel the payment of the specified tax upon all issues subsequent to that date. The contention of relator that it is, in any event, entitled to the registration of the supplemental instrument, we think unsound. The recital in that instrument describing the original mortgage and the record thereof, if recorded in Calhoun county, would (probably) be sufficient notice to the world of the character and extent of the lien imposed by the original instrument.

Upon this point relator's contention is based upon the language found in section 3, which provides:

"Such certificate shall not be required with any mortgage made to indemnify the mortgagee as surety, or to secure the performance by the mortgagor of any contract which does not require the payment of a specified sum of money, nor with any mortgage made to correct or perfect a mortgage previously recorded, on which the charges imposed by this act have been paid, if no new or additional indebtedness is created thereby."

Two answers present themselves to this contention. *First*, the supplemental instrument cannot be construed as in any true sense correcting or perfecting the original mortgage; and, *second*, by means of the second instrument a new or additional indebtedness is created. But why should relator be entitled to record upon payment of the tax upon the amount of the bond issue since January 1, 1912, only? By withholding the instrument from all further record, it is entitled to issue bonds thereunder, and in accordance with its terms, and as to such issues no tax can be demanded. But if it, for any reason, desires to record the same in a new county, why should it not com-

ply with the terms of the statute, and pay the tax upon the whole amount issued at the time the instrument is presented for record? It may be said that as to the $1,-250,000 issued prior to January 1, 1912, the relator, not having paid the tax, has indicated an intention to keep the mortgage under the *ad valorem* system, and that, as to that amount, it should be relieved of the tax. It cannot be denied that such a result would be equitable, for it may be supposed that, when the original mortgage was executed, relator made its financial engagements upon the basis of the law as it then stood, but the State in the exercise of its sovereign powers may, at will, change its methods of taxation. Moreover, the statute will be searched in vain for any authority for such action. Section 2 of the act imposes the tax, without exception, upon all mortgages recorded on or after the 1st day of January, 1912. The instruments here tendered for record come clearly and literally within the designation. Even though one of them has been heretofore recorded, they are now to be recorded, and it is that act which under the statute imposes the tax. Relator is not obliged to tender the instruments for record; it does so voluntarily.

A further reason for this view is presented in the fact that the newly-acquired property sought to be subjected to the lien becomes by virtue of the supplemental instrument (and perhaps by the original mortgage as well) security for the whole debt, as well that portion incurred prior to January 1, 1912, as the portion incurred subsequent to that date.

The writ is dismissed.

STEERE, C. J., and MOORE, McALVAY, KUHN, STONE, OSTRANDER, and BIRD, JJ., concurred.